# No. 22-50987

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

THOMAS SCOTT PERKINS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Western District of Texas, No. 4:20-cr-388

———————————

## BRIEF OF APPELLANT
## THOMAS SCOTT PERKINS

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

CARL R. HENNIES
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

**UNITED STATES v. THOMAS SCOTT PERKINS,**
**No. 22-50987**

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Thomas Scott Perkins,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley Hoff** and **John F. Bash,** former U.S. Attorneys;

4. **John Cannizzaro, Kevin Cayton, Eduardo Mendoza, Antonio Franco, Scott Greenbaum, Lance Kennedy, Martha Valadez, Matthew Ellis, Fidel Esparza III,** and **Andrew Cannon Weber,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Shane O'Neal, Christopher Carlin, Michael Gorman,** and **Elyse Bataller-Schneider,** Assistant Federal Public Defenders, who represented Defendant-Appellant in the district court; and

7. **Carl R. Hennies,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

## REQUEST FOR ORAL ARGUMENT

After trial, the district court sentenced Thomas Perkins, a young man living with a neurodevelopmental disorder and severe mental illness, to more than 150 years in prison. This appeal presents two important issues.

*First*, this Court must take a hard look at whether Perkins—who believed that cosmic forces would resolve his case and could not effectively assist his attorneys—was even competent to stand trial in the first place. *Second*, if the Court finds that he was, it must determine whether his sentence—including a more-than-100-year variance from the Sentencing Guidelines range—is procedurally and substantively reasonable.

Oral argument would help the Court analyze these complex issues and the lengthy record on appeal.

# TABLE OF CONTENTS

Request for oral argument ............................................................... iii

Table of authorities ......................................................................... vi

Jurisdiction ....................................................................................... 1

Introduction ..................................................................................... 2

Statement of the issues ................................................................... 5

Statement of the case ...................................................................... 6

Summary of the argument .............................................................. 25

Argument ......................................................................................... 27

I.  Perkins was not competent to stand trial ............................... 27

    A.  Standard of review. ........................................................... 27

    B.  The Constitution prohibits prosecuting a person who
        lacks the ability to assist his attorneys or rationally
        understand the proceedings. ............................................. 28

    C.  Perkins was not competent to stand trial because
        schizophrenia prevented him from assisting his
        attorneys and understanding the proceedings. ................. 30

        1.  Perkins suffers from schizophrenia, which causes
            him to experience delusions and hallucinations. ......... 31

            a.  Perkins has a long history of schizophrenia
                diagnoses and experiences persistent
                symptoms of schizophrenia. ............................... 32

            b.  Dr. Browning's outlier opinion is unconvincing
                because he did not explore Perkins's
                delusional beliefs. ............................................... 35

        2.  Perkins's delusion that cosmic forces would resolve
            his case prevented him from assisting his attorneys
            and understanding the proceedings. ........................... 37

D. Perkins needs hospitalization and treatment to determine whether his competency can be restored. ........ 43

II. Perkins's sentence is procedurally and substantively unreasonable. ........................................................ 44

A. Standard of review. .......................................... 45

B. Perkins's sentence is procedurally unreasonable because the district court failed to explain its staggering variance from the Guidelines range. ............... 45

    1. A district court must explain a sentence outside the Guidelines range, and a major variance must be supported by a compelling justification. ...................... 46

    2. The district court failed to explain its vast variance from the Guidelines. .................................... 47

C. Perkins's sentence—including an unprecedented 137-year variance above the Guidelines range—is substantively unreasonable. ................................ 49

    1. Anchored by the advisory Guidelines range, a sentence must be no greater than necessary to comply with the statutory sentencing factors. .............. 50

    2. The district court's sentence, which imposed a vast variance from an already harsh guideline, is not justified by the statutory sentencing factors................. 51

        a. As a starting point, the non-production child pornography guideline is particularly harsh because of escalating enhancements.................... 52

        b. None of the § 3553(a) factors justify the district court's vast variance from an already harsh guideline. .................................... 54

Conclusion..................................................... 64

# TABLE OF AUTHORITIES

## Cases

*Bruce v. Estelle,*
  536 F.2d 1051 (5th Cir. 1976) ................................................*passim*

*Colburn v. Cockrell,*
  37 F. App'x 90 (5th Cir. 2002) ....................................................... 30

*Cooper v. Oklahoma,*
  517 U.S. 348 (1996)............................................................. 28, 31

*Drope v. Missouri,*
  420 U.S. 162 (1975)........................................................ 28, 29, 40

*Dusky v. United States,*
  362 U.S. 402 (1960) ....................................................... 29, 37, 44

*Freeman v. United States,*
  564 U.S. 522 (2011) ........................................................... 50, 51

*Gall v. United States,*
  552 U.S. 38 (2007)...............................................................*passim*

*Holmes v. Levenhagen,*
  600 F.3d 756 (7th Cir. 2010).................................................. 36, 42

*Indiana v. Edwards,*
  554 U.S. 164 (2008)................................................................... 28

*Kimbrough v. United States,*
  552 U.S. 85 (2007) .................................................................... 57

*Lafferty v. Cook,*
  949 F.2d 1546 (10th Cir. 1991) .................................................... 42

*McGregor v. Gibson,*
  248 F.3d 946 (10th Cir. 2001) ..................................................... 40

*Medina v. California,*
  505 U.S. 437 (1992)............................................................ 29, 38

*New York v. Ferber,*
   458 U.S. 747 (1982) ........................................................ 58

*Peugh v. United States,*
   569 U.S. 530 (2013) ...................................................... 51

*Rita v. United States,*
   551 U.S. 338 (2007) ........................................ 31, 52, 62

*United States v. Boigegrain,*
   155 F.3d 1181 (10th Cir. 1998) ................................... 39

*United States v. Booker,*
   543 U.S. 220 (2005) ...................................................... 56

*United States v. Bostic,*
   907 F.3d 607 (5th Cir. 2020) ................................. 49, 50

*United States v. Chatman,*
   986 F.2d 1446 (D.C. Cir. 1993) ................................... 59

*United States v. Chon,*
   713 F.3d 812 (5th Cir. 2013) ....................................... 48

*United States v. David,*
   511 F.2d 355 (D.C. Cir. 1975) ............................... 30, 41

*United States v. Diehl,*
   775 F.3d 714 (5th Cir. 2015) ............................... 55, 62

*United States v. Dorvee,*
   616 F.3d 174 (2d Cir. 2010)............................. 50, 52, 53

*United States v. Douglas,*
   910 F.3d 804 (5th Cir. 2018) ....................................... 47

*United States v. Grober,*
   624 F.3d 592 (3d Cir. 2010) ........................................ 53

*United States v. Handlon,*
   53 F.4th 348 (5th Cir. 2022) ....................................... 31

*United States v. Hebert,*
   813 F.3d 551 (5th Cir. 2015) ....................................... 51

*United States v. Hoffman,*
    901 F.3d 523 (5th Cir. 2018).................................................. 51, 63

*United States v. Hudgens,*
    4 F.4th 352 (5th Cir. 2021) .......................................................... 51

*United States v. Israel,*
    2019 WL 6702522 (S.D.N.Y. Dec. 9, 2019) ................................... 60

*United States v. Joseph,*
    333 F.3d 587 (5th Cir. 2003) ...................................................... 27

*United States v. Lychock,*
    578 F.3d 214 (3d Cir. 2009)........................................................ 50

*United States v. Mason,*
    52 F.3d 1286 (4th Cir. 1995) ...................................................... 41

*United States v. McKown,*
    930 F.3d 721 (5th Cir. 2019) ...................................................... 43

*United States v. Miller,*
    665 F.3d 114 (5th Cir. 2011) ................................................. 53, 62

*United States v. Mondragon-Santiago,*
    564 F.3d 357 (5th Cir. 2009) ...................................................... 48

*United States v. Naidoo,*
    995 F.3d 367 (5th Cir. 2021)....................................................... 45

*United States v. Pervis,*
    937 F.3d 546 (5th Cir. 2019) ..................................... 27, 29, 31, 34

*United States v. Robinson,*
    778 F.3d 515 (6th Cir. 2015).................................................. 57, 60

*United States v. Simpson,*
    645 F.3d 300 (5th Cir. 2011) ...................................................... 34

*United States v. Smith,*
    440 F.3d 704 (5th Cir. 2006) ...................................................... 46

*United States v. Stone,*
    575 F.3d 83 (1st Cir. 2009) ........................................................ 52

*United States v. Williams,*
    553 F.3d 1073 (7th Cir. 2009) ...................................................... 57

*United States v. Zavesky,*
    839 F.3d 688 (8th Cir. 2016) ........................................................ 30

*Vitek v. Jones,*
    445 U.S. 480 (1980) ...................................................................... 43

*Watts v. Singletary,*
    87 F.3d 1282 (11th Cir. 1996) ...................................................... 30

**Statutes**

18 U.S.C. § 2252A(a)(2) ...................................................... 14, 21, 39

18 U.S.C. § 2252A(a)(5)(B) ........................................................... 14

18 U.S.C. § 2252A(b)(1) .......................................................... 21, 39

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3553(a) .................................................................. *passim*

18 U.S.C. § 3553(a)(1) ............................................................. 56, 57

18 U.S.C. § 3553(a)(2)(A) ................................................... 56, 62, 63

18 U.S.C. § 3553(a)(2)(B) ............................................................. 62

18 U.S.C. § 3553(a)(2)(C) ............................................................. 60

18 U.S.C. § 3553(a)(2)(D) ....................................................... 57, 60

18 U.S.C. § 3553(a)(4)(A) ............................................................. 52

18 U.S.C. § 3553(a)(6) ................................................................... 54

18 U.S.C. § 3553(c)(2) ............................................................ 46, 48

18 U.S.C. § 3742(a) ......................................................................... 1

18 U.S.C. § 4241 ..................................................................... 44, 64

18 U.S.C. § 4241(d) ..................................................................*passim*

18 U.S.C. § 4241(d)(1)................................................................ 43

18 U.S.C. § 4247(d)..................................................................... 35

28 U.S.C. § 1291......................................................................... 1

## Rules

Fed. R. App. P. 4(b)(1)(A)(i) ...................................................... 1

Tex. Disciplinary R. of Prof. Conduct 3.03 ..................................... 40

W.D. Tex. Local R. AT-7............................................................... 40

## Sentencing Guidelines

U.S.S.G. § 2G2.1 ...................................................................... 55

U.S.S.G. § 2G2.2 ................................................... 22, 52, 53, 54

U.S.S.G. § 2G2.2(a)(2)............................................................... 21

U.S.S.G. § 2G2.2(b)(2)............................................................... 22

U.S.S.G. § 2G2.2(b)(3)(F)........................................................... 22

U.S.S.G. § 2G2.2(b)(4)............................................................... 22

U.S.S.G. § 2G2.2(b)(6)............................................................... 22

U.S.S.G. § 2G2.2(b)(7)(D).......................................................... 22

U.S.S.G. Ch.5, Pt.A ................................................................... 22

U.S.S.G. § 5G1.2....................................................................... 23

U.S.S.G. § 5G1.2(d) .................................................................. 47

U.S.S.G. § 5G1.2 cmt. n.1 .......................................................... 47

## Other Authorities

ABA Standards for Criminal Justice 7-4.3(c).................................. 39

ABA Standards for Criminal Justice 7-4.3(e) ................................ 40

Am. Psychiatric Ass'n, *Diagnostic and Statistical
    Manual of Mental Disorders* (5th ed. 2013).........................*passim*

Christine N. Cea, *Autism and the Criminal Defendant*,
    88 St. John's L. Rev. 495 (2014) .................................................... 59

Colleen M. Berryessa, *Defendants with Autism Spectrum
    Disorder in Criminal Court: A Judges' Toolkit*,
    13 Drexel L. Rev. 841 (2021) ................................................. 59, 60

Mayo Clinic, *Autism Spectrum Disorder*......................................... 6

Mayo Clinic, *Schizophrenia* ........................................................... 34

Michael L. Perlin et al., *"Some Things Are Too Hot to Touch"*:
    *Competency, the Right to Sexual Autonomy, and the
    Roles of Lawyers and Expert Witnesses*,
    35 Touro L. Rev. 405 (2019)......................................................... 58

U.S. Sent'g Comm'n, *Federal Sentencing of Child
    Pornography: Non-Production Offenses* (2021)..................... 53, 56

U.S. Sent'g Comm'n,
    *Interactive Data Analyzer* .................................................... 53, 55

U.S. Sent'g Comm'n,
    *Judicial Sentencing Information (JSIN)* .............................. 54, 55

# JURISDICTION

This is an appeal from a final judgment in a criminal case alleging violations of federal law. The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered its judgment on November 2, 2022. ROA.432–40. Perkins timely appealed six days later. ROA.442; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## INTRODUCTION

Despite facing a slew of serious criminal charges, Thomas Perkins did not think that he was in legal jeopardy. Rather, Perkins—a young man suffering from schizophrenia and autism spectrum disorder—believed that two "angels" whose voices he hears would suddenly release him from jail. He trusted that these cosmic forces would cause evidence to disappear or convince either the judge or the prosecutor to dismiss his case. So confident was he in his angels' salvation that he refused to even consider a plea agreement that would have ensured a sentence a fraction of the one he received.

Because of this delusion that divine intervention—and not the jury, the judge, or the evidence—would determine the outcome of his case, Perkins not only failed to comprehend the consequences confronting him, but he also had little incentive to assist his attorneys. Perkins's attorneys were in the best position to determine whether he was competent, and they had a professional duty to raise any concerns. Every attorney who represented Perkins expressed grave doubts about his competence and described difficulties working with him. Counsel consistently raised these worries not out of gamesmanship, but out of a good faith concern that Perkins was basing life-altering decisions on delusions, not reasoned judgment.

To stand trial consistent with the Constitution, Perkins must have been able to both effectively assist his attorneys *and* grasp the consequences he faced. Overwhelming evidence showed that he could do neither. Still, the district court—in a short order lacking any analysis—found that he was competent. Because of the significant constitutional rights at stake, that is not a finding that this Court can simply rubber-stamp. Rather, the Court must re-analyze the facts and take a hard look at the district court's conclusion. The district court's order cannot survive this scrutiny. The only evidence that Perkins was competent was an outlier opinion from a doctor who disregarded Perkins's long history of schizophrenia and did not delve into Perkins's deeply held delusions. Prosecuting Perkins violated the Constitution. Thus, this Court should reverse all counts of conviction.

After subjecting Perkins to an unconstitutional trial, the district court imposed a shockingly severe sentence. The court sentenced Perkins to 1,890 months (more than 157 years) in prison. This sentence includes an astronomical and apparently unprecedented 1,650-month variance (more than 137 years) above the range recommended by the Sentencing Guidelines. Putting aside the district court's lack of explanation for such a vast variance—a

procedural error which, by itself, is enough to remand for resentencing—the court's draconian sentence is substantively unreasonable. Nothing about this case warrants such a drastic deviation from an already harsh Guidelines recommendation. Perkins—who has severe mental illness and poses no danger to the public—received an effective life sentence for a crime that similar offenders receive about 12 years for. So even if this Court finds that Perkins was competent to stand trial, it should vacate his sentence and remand for the district court to impose a lower sentence.

In short, Perkins is now serving an exceedingly harsh prison sentence that he naively—but sincerely—never believed he would have to serve. His convictions should be reversed or, at the very least, his case should be remanded for resentencing.

## STATEMENT OF THE ISSUES

**1. Competency.** Perkins suffers from schizophrenia and believed that cosmic forces—two "angels" whose voices he hears—would determine the outcome of his case. This delusion that he would be suddenly released from jail by divine intervention prevented Perkins from effectively assisting his attorneys and rationally understanding the profound consequences of the charges against him. Was Perkins competent to stand trial?

**2. Sentencing.** The district court sentenced Perkins to more than 157 years in prison—including an upward variance of more than 137 years above the Guidelines range—but failed to explain its reasoning for such a vast variance. And the court's severe sentence is not justified by any of the statutory sentencing factors. Is the district court's sentence procedurally and substantively reasonable?

## STATEMENT OF THE CASE

**Perkins's background.** Thomas Perkins, who is now in his early 30s, has led a difficult life. He has a long history of neurodevelopmental disorders and mental illnesses—including autism spectrum disorder and schizophrenia—and he suffers from a painful physical disability. As a result of these conditions, he has been hospitalized multiple times, he struggled in school, he cannot work, he has trouble making friends, and he is homebound.

*Autism spectrum disorder.* From an early age—and continuing to the present—Perkins has been diagnosed with autism spectrum disorder. ROA.2033, 2039, 2150.[1] Autism spectrum disorder is a "lifelong developmental condition in which an individual has problems developing and maintaining social relationships." ROA.931; *see also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 31–32, 50–59 (5th ed. 2013). Individuals with autism struggle to interpret emotions, facial

---

[1] "Autism spectrum disorder includes conditions that were previously considered separate," including Asperger's syndrome. Mayo Clinic, *Autism Spectrum Disorder*, https://www.mayoclinic.org/diseases-conditions/autism-spectrum-disorder/symptoms-causes/syc-20352928. Some of Perkins's earlier medical records refer to Asperger's syndrome, but this brief refers to his condition as autism spectrum disorder.

expressions, and social cues. ROA.946, 2015. These social deficits can make it difficult to make friends, and autistic individuals tend to live solitary lives. ROA.939. Autism is also defined by "repetitive patterns of behavior, interests, or activities." DSM-5 at 50; *see* ROA.944–45, 2015, 2047. Many people with autism "collect things for no apparent reason other than the fact that they want to have a collection of something, and they want to organize it by some characteristic." ROA.944–45. And because they often insist on sticking to strict routines, autistic individuals can become frustrated if their routine is disrupted. ROA.943.

Perkins exhibits several symptoms typical of individuals with autism spectrum disorder. When interacting with other people, he has poor eye contact, monotone speech, flat emotion, and difficulty staying on topic. ROA.932–33. He can become frustrated and lose focus during tasks that cause him stress. ROA.2042. Perkins also prefers consistency in his routine and struggles with adjusting to changes. ROA.2042. For example, Perkins had a specific and lengthy shower routine as a teenager. ROA.2039. When there was not enough time to complete the entire routine, he would simply forgo showering (despite the resulting hygiene problems). ROA.2039. Finally, Perkins often becomes fixated on certain interests, such as

computers and video games, and behaviors, such as downloading files from the internet. ROA.933, 1917, 1920.

*Schizophrenia.* Perkins also has a long history of schizophrenia, schizoaffective disorder, and other psychotic disorders.[2] Doctors first diagnosed Perkins with schizophrenia when he was a teenager, ROA.2015, 2150, and multiple doctors have recently confirmed the diagnosis, ROA.1934, 2033. Schizophrenia is a "severe mental illness in which a person loses contact with reality." ROA.936. Delusions and hallucinations are "key features" of schizophrenia. DSM-5 at 87, 99–100; *see* ROA.936. Delusions are "fixed beliefs that are not amenable to change in light of conflicting evidence." DSM-5 at 87. Hallucinations are involuntary "perception-like experiences that occur without external stimulus." *Id.*

Perkins experiences both hallucinations and delusions. Perkins continuously hears the voices of two "angels"—a male and a female— that he believes are assigned to him. ROA.552, 2010, 2012, 2031.

---

[2] Schizoaffective disorder and schizophrenia are both psychotic disorders that are defined, at least in part, by hallucinations and delusions. *See*, *e.g.*, DSM-5 at 87, 99, 105. Because the relevant symptoms overlap, this brief refers to these conditions collectively as schizophrenia.

During these auditory hallucinations, these angels tell Perkins how to act, such as telling him that he can refuse the COVID vaccine. ROA.552, 2031. Perkins also experiences tactile hallucinations in the form of a female "sex demon." ROA.937, 2010, 2031. Perkins reported that this demon has tormented him for over a decade and "has sex" with him routinely. ROA.2031. This is a sensation that he can "actually feel." ROA.785, 1935. And, throughout this case, Perkins was under a delusion—explained further below—that his angels would make the case go away. *See*, *e.g.*, ROA.2033–34.

*Other mental conditions.* Besides autism spectrum disorder and schizophrenia, Perkins has also been diagnosed with several other conditions affecting his cognitive functioning and mental health, including depressive disorder, generalized anxiety disorder, and attention-deficit/hyperactivity disorder. ROA.2039, 2150. As a result of these diagnoses, Perkins spent most of his childhood under the care of psychiatrists. ROA.2150.

*Physical limitations.* Along with mental illnesses, Perkins also has physical limitations. He was born with a bone disorder called multiple hereditary exostosis. ROA.2151, 2039. This condition causes extra bone growths, and Perkins has endured several surgeries—both as a child and as an adult—to remove the growths.

ROA.2151. Because of this condition, his movements are impaired, ROA.2040, and walking long distances is painful, ROA.2151.

*Struggles in school.* Perkins struggled both academically and behaviorally in school. ROA.2150. He often fell behind in his schoolwork, found it difficult to make friends, and was bullied because he was different. ROA.2150. He felt depressed as a teenager and experienced social anxiety. ROA.2030, 2039. During middle school, Perkins was hospitalized for a week after he told his parents he planned to commit suicide. ROA.1934, 2030, 2150. He was almost kicked out of high school before being allowed to graduate. ROA.2150. And he took a few courses at a technical school, but, because of an incident, he was asked to leave before he received a degree. ROA.1935, 2009, 2150.

*Hardships as an adult.* Perkins has never been able to function well enough to even apply for a job, so he receives Social Security disability benefits. ROA.505, 2029, 2151. Even as an adult in his late 20s, he still lived with his parents. ROA.504, 1933, 2151. He is homebound without a car or a driver's license. ROA.1917, 2151. He has never had a romantic relationship, ROA.2029, and he has little interest in developing connections or relationships with other people, ROA.2041. Although Perkins had been prescribed

antipsychotic medication for schizophrenia, he stopped taking it by his mid-20s. ROA.2039. In early 2020, Perkins displayed violent episodes toward his parents and was hospitalized for a week. ROA.1934, 2040.

**The offense conduct.** Because Perkins had no friends and rarely left the house, he became addicted to computers. ROA.738–39, 1917. In particular, Perkins was addicted to downloading content from the internet. ROA.739. He "liked downloading stuff and watching it upload and download for the sake of watching it." ROA.739. So he searched for "basically everything that he possibly could." ROA.778. Using BitTorrent—a peer-to-peer file sharing network that allows users to download and share files with other users—he ran extremely broad searches. ROA.1914, 1919–20. He searched for terms such as "image" or "jpg" (a common type of image file). ROA.1920. Once he had collected immense amounts of information, he would weed through it and decide what he wanted to keep and what he wanted to get rid of. ROA.697, 1920. In short, Perkins "enjoyed searching," and "he enjoyed the downloading and uploading." ROA.697.

At some point, Perkins became interested in the distinction between child pornography and nudity based on his understanding

that, under a Supreme Court ruling, child nudity was legal. ROA.701, 1920, 2046. So he began conducting his own "research" as an "experiment[]," "try[ing] to figure out what was legal and what was not." ROA.1920, 2046. This ill-conceived experiment led Perkins to search for and download tens of thousands of images and videos containing illegal child pornography. ROA.1922.[3]

The default for most peer-to-peer file-sharing networks like BitTorrent is to share content in a shared folder with other users. ROA.654–56. Because Perkins did not disable this sharing feature on his BitTorrent account, government agents downloaded multiple files containing suspected child pornography from his parents' IP address in late 2019. ROA.1914–15, 1920. Soon after, officials obtained a search warrant for his parents' house (where he lived)

---

[3] There was some dispute over exactly how many images and videos contained child pornography. The presentence report cited trial testimony to conclude that Perkins had more than 95,000 images and over 1,000 videos containing child pornography. ROA.1928. But the case agent testified that he only "suspected" that about 100,000 files might contain illegal material, and he admitted that nobody had reviewed all those files. ROA.816; *see* ROA.1950 (Perkins's objection to presentence report). In any event, there is no dispute that Perkins's compulsive downloading amassed an extensive amount of child pornography across his devices.

and seized several computers and hard drives belonging to Perkins that contained child pornography. ROA.1921–22.

While agents were searching his parents' house, other agents interrogated (and polygraphed) Perkins. ROA.1918–21. When officials questioned him about the material on his computers involving underage children, Perkins asserted that he had "been meaning to clear all that stuff out." ROA.1919. He acknowledged that he had used VPN applications, or virtual private networks, to try to conceal his identity online. ROA.1920–21. Perkins stated that he was aroused by some of the content, particularly "nudist" content depicting children between 8 and 10 years old. ROA.702, 1920–21. He also said that he had masturbated to underage "nudist" content, although not for over a year by that time. ROA.1920. Perkins admitted that he would be willing to have sex with a 12-or-13-year-old child, but only if the child prompted the encounter and they had access to a secure environment. ROA.791, 1921. He also noted that he had not acted on that desire. ROA.1921. Finally, Perkins told agents that he had accidentally touched a girl's chest while roughhousing at a church event a few years before, an encounter that he denied was sexual but that apparently upset the girl. ROA.1921.

**The indictment.** A second superseding indictment charged Perkins with nine counts. ROA.356–63. Count one charged Perkins with distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2). ROA.356. Counts two through nine charged Perkins with possessing different computers or hard drives containing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). ROA.356–60.

**Counsel's competency concerns.** After being indicted, Perkins was represented by several attorneys in the district court. And, as the district court acknowledged, his attorneys "asserted from the get-go that he was not competent." ROA.1068. Indeed, every attorney who represented Perkins raised significant doubts about his competence to stand trial.

*Initial competency concerns and the first competency hearing.* Soon after being appointed, Perkins's first attorney filed a motion for a mental examination. ROA.144–45. After meeting with Perkins to discuss the case—including the option to plead guilty or go to trial— counsel believed that Perkins "may be incompetent to such an extent that he cannot understand the proceedings against him or properly assist in his own defense." ROA.144. In response, the magistrate judge ordered a psychological examination. ROA.151–52.

Dr. Lacie Biber, a psychologist with the Bureau of Prisons, examined Perkins. ROA.2006–17. Perkins told Dr. Biber that he "experienced voices," including male and female voices that he can hear inside his head and are from his "assigned angels." ROA.2010. Perkins also told Dr. Biber that he was often visited by a "sex demon" that said sexual things to him. ROA.2010. Dr. Biber noted that there was no evidence that Perkins was attempting to "overreport" his symptoms. ROA.2013.

Dr. Biber diagnosed Perkins with autism spectrum disorder. ROA.2014–15. Despite several prior diagnoses of schizophrenia and Perkins hearing voices (a common symptom of schizophrenia), Dr. Biber ruled out schizophrenia as a diagnosis. ROA.2015–16. Dr. Biber discounted the voices Perkins hears as a "literal interpretation of what he learned through his church" and the sex demon as "his interpretation of puberty." ROA.2016. And although she found that Perkins demonstrated "some impairment" concerning "his appreciation or rational understanding of the proceedings against him," ROA.2014, Dr. Biber concluded that Perkins was competent to stand trial, ROA.2017.

The magistrate judge held a brief competency hearing. ROA.2326–33. Dr. Biber did not testify. Relying solely on Dr. Biber's

report, the magistrate judge determined that Perkins was competent to stand trial. ROA.156–57.

*Renewed competency concerns and the second competency hearing.* Soon after the first competency hearing, new attorneys took over Perkins's case. As these new attorneys prepared his case, they too expressed recurring concerns about his competence. *See* ROA.177 (explaining that Perkins's mental condition presented "challenges to counsel's ability to effectively represent [him]"); ROA.191 (explaining that "counsel cannot engage in lengthy discussions" with Perkins because of his mental condition); ROA.198 (explaining that the scope of issues related to Perkins's mental health "was not entirely apparent until recent months").

A few months after the first competency hearing, Perkins's counsel had become "increasingly concerned" about Perkins's competence to stand trial and requested another competency hearing. ROA.2023–26. Counsel explained that Perkins believed that "otherworldly beings with cosmic powers will determine the outcome" of his case, ROA.2082, and that he was driven by an "unfaltering idea that ultimately all of this will go away," ROA.601. As a result, Perkins was not making decisions based on "legal discussions" with his lawyers about evidence, elements of the

16

crimes, burdens of proof, sentencing, or a potential plea agreement. ROA.601–03, 2082. Counsel explained that "Perkins simply was not able to assist [counsel] with his defense despite a basic understanding of the proceedings," ROA.2024, and that he did not understand the consequences of those proceedings, ROA.2026. Perkins's attorneys denied raising competency out of "gamesmanship," ROA.1084, and confirmed that they "do not make it a practice to raise competency concerns absent substantial concerns with a client," ROA.2082.

In support of the motion, counsel included a psychological evaluation by Dr. James W. Schutte. ROA.2029–34. Dr. Schutte noted that, during the examination, Perkins's "cognitive functions appeared impaired," his "speech was intelligible but rambling," he "gave eccentric answers to questions," and his "thought patterns were delusional." ROA.2032. Perkins told Dr. Schutte that he hears the voices of two "angels" on a "continuous basis." ROA.2031. The angels give Perkins "signs of things" and provide him with information. ROA.2031. Perkins believed that the angels would cause him to be suddenly released from jail, either by causing evidence to disappear or by influencing the judge or prosecutor. ROA.2031. Perkins conveyed that if the angels provided him with

legal advice, he would rely on it more than the advice of his attorneys. ROA.2031. Perkins also told Dr. Schutte about a female "sexual demon" that had been tormenting him for a decade. ROA.2031. Perkins stated that he has sex with the demon on a "regular basis," including just a day or two before the examination. ROA.2031. Dr. Schutte noted that nothing suggested that Perkins was exaggerating his symptoms. ROA.2033.

Dr. Schutte diagnosed Perkins with schizoaffective disorder, autism spectrum disorder, ADHD, and unspecified anxiety disorder. ROA.2033. In doing so, Dr. Schutte noted that Perkins suffers from "auditory, visual, and tactile hallucinations, as well as delusions." ROA.2033. Dr. Schutte concluded that although Perkins understood the technical terms and facts relevant to his case, his "delusional belief" that he will be suddenly released from jail by divine intervention is "impacting his appreciation of his legal predicament" and "impairing his ability to work effectively with his legal counsel." ROA.2034. Dr. Schutte remained optimistic that, with psychiatric hospitalization and treatment, there was a good chance that Perkins's competency could be restored. ROA.2034.

In response to Perkins's motion for a second competency hearing, the government requested another psychological examination.

ROA.202–03. Dr. Samuel Browning, another psychologist with the Bureau of Prisons, evaluated Perkins. ROA.2037–44. Dr. Browning noted that medical records contained information about "psychotic symptoms" that have been "interpreted as delusions and hallucinations." ROA.2039–40. Although Perkins did not discuss his delusions during the evaluation with Dr. Browning, Dr. Browning thought the evidence he reviewed "suggests" that these voices were "likely concrete descriptions of religious beliefs and experiences." ROA.2040. Dr. Browning relied on Dr. Biber's evaluation in diagnosing Perkins with autism spectrum disorder. ROA.2041–42. Dr. Browning concluded that Perkins was competent to stand trial, noting that he "displayed a sufficient factual understanding of the legal proceedings," "described realistic thought processes regarding possible outcomes in this matter," and "demonstrated no overt difficulties regarding his current ability to properly assist counsel." ROA.2043–44. Like Dr. Biber and Dr. Schutte, Dr. Browning saw no indication that Perkins was exaggerating his symptoms. ROA.2041.

The district court held a competency hearing, and both Dr. Schutte and Dr. Browning testified. *See* ROA.544–609. Dr. Schutte explained that Perkins was suffering from "hallucinations and delusions" and, as a result, Perkins did not believe that he was in

legal jeopardy. ROA.552–53. Dr. Schutte also explained that those hallucinations and delusions could not be considered mere spiritual beliefs because Perkins's "beliefs are more extreme than those of his fellow church members" and "go far … beyond those of a religious nature and actually enter into the realm of a psychotic condition." ROA.553. Dr. Schutte concluded that Perkins was not competent. ROA.551–52. Dr. Browning, by contrast, testified that he believed Perkins was competent. ROA.581. But Dr. Browning admitted that he could not opine on the angelic and demonic hallucinations because Perkins did not make similar statements during his evaluation. ROA.583, 586, 589. If he had, Dr. Browning would have wanted to explore the topic further. ROA.589. And Dr. Browning agreed that Perkins's statements about angels and a sex demon sounded "like a delusion or a hallucination." ROA.591.

In a brief order, the district court found that Perkins was "not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." ROA.230–31. Thus, the court held that Perkins was competent to stand trial. ROA.231.

*Continuing competency concerns.* Even after the district court found Perkins competent, his counsel continued to raise serious concerns about his competency. *See*, *e.g.*, ROA.349 (during pretrial motion practice); ROA.1068 (at sentencing); ROA.428–29 (in motion to correct or reconsider sentence).

**Plea negotiations.** Perkins refused to consider any plea agreement because he did "not want to sentence himself," even though he recognized that a plea agreement would lead to a lower sentence. ROA.2031. Indeed, the government offered to let Perkins plead guilty to only the distribution charge (count one). ROA.428. That charge carried a maximum sentence of 20 years. *See* 18 U.S.C. § 2252A(a)(2), (b)(1). But Perkins was "incapable" of even discussing this or any other plea agreement. ROA.428.

**Trial.** Because the district court found him competent and he refused to consider a plea agreement, the only option left was for Perkins to go to trial. After a two-day trial, the jury found Perkins guilty on all nine counts. ROA.398–400.

**Sentencing.** Before sentencing, probation prepared a presentence report. ROA.1902–41. The report calculated Perkins's base offense level as 22. ROA.1930; *see* U.S.S.G. § 2G2.2(a)(2). The report added two levels because the material involved prepubescent

minors (*see* U.S.S.G. § 2G2.2(b)(2)), two levels for distribution (*see id*. § 2G2.2(b)(3)(F)), four levels for material portraying sadistic or masochistic conduct and abuse of infants or toddlers (*see id*. § 2G2.2(b)(4)), two levels because the offense involved a computer (*see id*. § 2G2.2(b)(6)), and five levels because the offense involved 600 or more images (*see id*. § 2G2.2(b)(7)(D)). ROA.1931–32. Perkins has no criminal history, ROA.1932–33, so a total offense level 37 and criminal history category I produced an advisory Guidelines range of 210 to 240 months' imprisonment. ROA.1936; *see* U.S.S.G. Ch.5, Pt.A. Probation identified no factors warranting a departure from the Guidelines. ROA.1940.

Perkins argued at length for a downward variance. ROA.1083–95, 2128–35. *First*, Perkins explained that the guideline for non-production child pornography offenses, U.S.S.G. § 2G2.2, is too harsh. ROA.2129–30. He noted that he was facing a greater sentence than he would if he had used the internet to entice and then sexually abuse a child. ROA.2130. *Second*, Perkins argued that his mental conditions were a mitigating factor that the district court must consider. ROA.2130–32. He explained that autism spectrum disorder was a major catalyst that led him to start obsessively hoarding nude pictures and child pornography,

ROA.2131, and that hallucinations caused by his schizophrenia exacerbated his inability to understand the wrongfulness of his actions, ROA.2132. *Finally*, Perkins asserted that significant prison time was unnecessary because he posed little risk to the public, any future criminal conduct could be prevented by conditions of supervised release, and autism spectrum disorder would make him vulnerable in jail. ROA.2133–34.

The government, by contrast, urged the district court to impose a sentence at the high end of the Guidelines or to impose an upward variance. ROA.1103–04. The government also suggested running the sentences on each count consecutively. ROA.1106. The district court interpreted the government's variance motion as a request "[n]ot to vary outside the guidelines, but to give the high end and run them all consecutive," and the government agreed. ROA.1106. But the court then expressed confusion over whether running the sentences consecutively would, in fact, be a variance. ROA.1106. In response, the government asked for a variance to be safe, ROA.1106, and Perkins explained that any sentence above the Guidelines would be a variance, ROA.1106–07 (citing U.S.S.G. § 5G1.2).

In imposing the sentence, the district court cited 18 U.S.C. § 3553(a) and indicated that it would "not depart from the

recommended sentence" because it found the Guidelines range "fair and reasonable." ROA.1110. The court sentenced Perkins to 210 months on each of the nine counts to run consecutively, resulting in a total sentence of 1,890 months (or 157 and a half years). ROA.1110. The court believed that it had sentenced Perkins at the "low end of the guidelines." ROA.1113. When Perkins again explained that running the sentences consecutively was an upward variance, the court—without further explanation—said that it would "vary upward for that purpose from the low end of the guidelines." ROA.1113. The court also imposed a life term of supervised release, including conditions that prohibit Perkins from possessing or using computers and prevent him from using the internet unless approved by a probation officer. ROA.1111–12; *see* ROA.435–36.

Perkins moved to correct or reconsider the sentence, arguing that the district court failed to explain its substantial upward variance and that the 1,650-month (more than 137-year) variance was "exceedingly harsh under the circumstances." ROA.427–29. Still, the district court entered its judgment the next week reflecting the same sentence imposed at the hearing. ROA.432–38.

Perkins now appeals his convictions and his sentence. ROA.442.

## SUMMARY OF THE ARGUMENT

**1.** Perkins was not competent to stand trial. It violates the Constitution to try a defendant for a crime if the defendant lacks *either* the ability to effectively assist his attorneys *or* the ability to grasp the consequences he faces. Perkins lacked both. Perkins has a long history of suffering from schizophrenia, which causes him to experience delusions and hallucinations. Throughout this case, Perkins did not believe that he was in legal jeopardy because of an unfounded but unfaltering delusion that cosmic forces would make the case go away. The best evidence of Perkins's competence came from his own attorneys, who all repeatedly expressed grave doubts about his competence and adamantly asserted that Perkins could not assist in his defense or understand the consequences of the proceedings. The only contrary evidence supporting the district court's competency determination was an outlier opinion from a doctor who disagreed with a decade of consistent schizophrenia diagnoses and did not probe the delusion at the heart of this case.

The government failed to meet its burden of showing that Perkins was competent, and the district court clearly erred by finding him competent. Perkins's trial was unconstitutional, so this Court should reverse all counts of conviction.

**2.** Even if Perkins was competent to stand trial, the district court's shockingly severe 157-year sentence cannot stand.

*First*, the district court's sentence was infected by procedural error. After expressing confusion about whether it could run the sentences on all nine counts consecutively *within* the Guidelines, the court ultimately decided that it would vary from the Guidelines range by more than 137 years. But the court gave no explanation at the hearing or in its statement of reasons for such a drastic deviation.

*Second*, the district court's severe sentence is substantively unreasonable. Starting from the already harsh guideline for non-production child pornography offenses—a guideline that sister circuits have criticized as draconian, irrational, and harsher than necessary—the court imposed a *137-year* upward variance. None of the sentencing factors justify such a wildly disproportionate variance: Perkins has severe mental illness, he poses no threat to the public, and similar defendants receive far shorter sentences.

Whether on procedural or substantive grounds—or both—the Court should vacate Perkins's sentence and remand for the district court to impose a lower sentence.

## ARGUMENT

### I.    Perkins was not competent to stand trial.

The Constitution prohibits prosecuting someone who cannot effectively assist his attorneys or rationally understand the consequences of the proceedings against him. Perkins suffers from schizophrenia and believed that two "angels"—not the judge, the jury, or the evidence—would determine the outcome of his case. This delusion hindered his ability to assist his attorneys—who repeatedly expressed doubts about his competence—and prevented him from grasping the profound consequences he was facing. The district court clearly erred by finding that Perkins was competent to stand trial, so this Court should reverse all counts of conviction.

#### A.    Standard of review.

This Court reviews a district court's competency determination "using a species of clear error review." *United States v. Pervis*, 937 F.3d 546, 554 (5th Cir. 2019) (cleaned up). The Court must "re-analyze the facts," take a "hard look" at the district court's finding, and reverse if that finding was "clearly arbitrary or unwarranted." *United States v. Joseph*, 333 F.3d 587, 589 (5th Cir. 2003). In other words, this Court's task is not to rubber-stamp the district court's finding, but to undertake a "critical reappraisal." *Bruce v. Estelle*,

536 F.2d 1051, 1062 (5th Cir. 1976). After taking a "hard look," this Court does not hesitate to reverse the district court's finding that a defendant was competent to stand trial. *See, e.g., id.* at 1060–63 (reversing district court's competency finding because defendant's "schizophrenic condition prevented him from effectively consulting with counsel and rationally understanding the proceedings").

### B. The Constitution prohibits prosecuting a person who lacks the ability to assist his attorneys or rationally understand the proceedings.

The Constitution prohibits the "trial of an individual who lacks mental competency." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). This "prohibition is fundamental to an adversary system of justice." *Drope v. Missouri*, 420 U.S. 162, 172 (1975). And the "consequences of an erroneous determination of competence are dire," threatening a panoply of rights "deemed essential to a fair trial": the right to effective assistance of counsel; the rights to summon, confront, and cross-examine witnesses; and the right to testify on one's own behalf or to remain silent without penalty for doing so. *Cooper v. Oklahoma*, 517 U.S. 348, 354, 364 (1996) (cleaned up).

A defendant is not competent to stand trial if he is "presently suffering from a mental disease or defect rendering him mentally

incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). This test proceeds in two steps. *First*, the court must "ascertain the nature of the [defendant's] allegedly incapacitating illness." *Bruce*, 536 F.2d at 1059. *Second*, the court must decide whether the defendant has both the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" *and* a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). The government bears the burden of proving that the defendant is competent to stand trial. *Pervis*, 937 F.3d at 554.

In applying this test, the court may consider several factors, including the defendant's demeanor, medical testimony, and observations of individuals that have interacted with the defendant. *Id.* The Supreme Court has explained that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina v. California*, 505 U.S. 437, 450 (1992); *see Drope*, 420 U.S. at 178 n.13 (counsel's "expressed doubt" about client's competency is "unquestionably a factor which should be considered"). "Because legal competency is primarily a function of

defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996); *see Colburn v. Cockrell*, 37 F. App'x 90, at *5 (5th Cir. 2002) (same). Thus, "counsel's opinion on competency should receive significant weight," *United States v. Zavesky*, 839 F.3d 688, 693 (8th Cir. 2016), and "may be as valuable as an expert psychiatric opinion on his competency," *United States v. David*, 511 F.2d 355, 360 (D.C. Cir. 1975).

### C. Perkins was not competent to stand trial because schizophrenia prevented him from assisting his attorneys and understanding the proceedings.

Perkins was not competent to stand trial. *First*, Perkins suffers from schizophrenia, a clinically recognized disorder that causes delusions and hallucinations. *Second*, his unwavering delusion that cosmic forces would resolve his case prevented him from assisting his attorneys and understanding the consequences of the charges against him.

The district court reached a contrary conclusion in a cursory order lacking any explanation. The court simply listed the evidence presented and found, without analysis, that Perkins was competent.

ROA.230–31. This Court has explained that "judges have an obligation to say enough that the public can be confident that cases are decided in a reasoned way." *United States v. Handlon*, 53 F.4th 348, 353 (5th Cir. 2022). Of course, the "appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances." *Rita v. United States*, 551 U.S. 338, 356 (2007). But a competency determination is a "complicated task," *Pervis*, 937 F.3d at 558, and the consequences of an incorrect determination are "dire," *Cooper*, 517 U.S. at 364. So appellate review of a competency finding is hindered when the district court "does not disclose the rationale for [its] conclusion." *Bruce*, 536 F.2d at 1062.

Still, this Court must take a hard look at the record. And, after doing so, this Court should hold that the district court erred by finding Perkins competent to stand trial.

### 1. Perkins suffers from schizophrenia, which causes him to experience delusions and hallucinations.

At the first step of the competency analysis, Perkins presented overwhelming medical evidence that he was "suffering from a mental disease or defect"—schizophrenia. *See* 18 U.S.C. § 4241(d). Compared to the consistent diagnoses of schizophrenia by doctors

over more than a decade, Dr. Browning's contrary conclusion—
which did not probe Perkins's delusion that angels would resolve
his case—is entitled to little weight.

### a. Perkins has a long history of schizophrenia diagnoses and experiences persistent symptoms of schizophrenia.

Perkins has a long history of suffering from schizophrenia as
diagnosed by several psychologists over many years. Doctors first
diagnosed Perkins with schizophrenia when he was a teenager.
ROA.2015; *see* ROA.2150 (noting that doctors diagnosed Perkins
with "psychotic disorders" and "psychosis" around the same time).
Perkins was prescribed antipsychotic medication for schizophrenia.
ROA.2039. When he was in his late 20s, Perkins was hospitalized
and again diagnosed with schizophrenia. ROA.1934, 2011. And, in
late 2021, Dr. Schutte evaluated Perkins and yet again confirmed
the schizophrenia diagnosis. ROA.936–937, 2033–34. Nothing in
the record suggests that any medical professional doubted this
consistent diagnosis before this case.

Schizophrenia is "a severe mental illnesses in which a person
loses contact with reality." ROA.936. Two "key features" of
schizophrenia are delusions and hallucinations. DSM-5 at 87, 99;

*see* ROA.936. As explained above, delusions are "fixed beliefs that are not amenable to change in light of conflicting evidence," and hallucinations are involuntary "perception-like experiences that occur without external stimulus." DSM-5 at 87.

Perkins experiences both auditory and tactile hallucinations consistent with schizophrenia. Perkins incessantly hears the voices of two "angels" that he believes are assigned to him. ROA.552, 2010, 2012, 2031. These angels tell Perkins how to act, such as telling him that he can refuse the COVID vaccine. ROA.552, 2031. Perkins also feels the presence of a female "sex demon" that has tormented him for over a decade. ROA.937, 2010, 2031. Perkins reports regularly having sex with the demon, a tactile hallucination that "feels real to him." ROA.785, 1935, 2031.

Perkins also experiences delusions typical of individuals with schizophrenia. For instance, Perkins believed that the angels he hears would make his criminal case go away by making evidence disappear or by influencing the judge or the prosecutor. ROA.552–53, 2031, 2033–34. Perkins repeatedly conveyed this delusion to both medical professionals, *see*, *e.g.*, ROA.2033–34, and his lawyers, *see*, *e.g.*, ROA.2082.

Besides exhibiting symptoms of schizophrenia, Perkins also has experienced many complications common with schizophrenia. *See* Mayo Clinic, *Schizophrenia*, https://www.mayoclinic.org/diseases-conditions/schizophrenia/symptoms-causes/syc-20354443.    Perkins has had thoughts about suicide, ROA.2030; has felt anxious and depressed, ROA.2030; is socially isolated, ROA.2039; has struggled with school and cannot work, ROA.2150–51; and has shown aggressive behavior, ROA.1934.

Not only does Perkins report symptoms and complications of schizophrenia, but there is no suggestion that Perkins is "malingering," *Pervis*, 937 at 555–58, or "exaggerating his symptoms," *United States v. Simpson*, 645 F.3d 300, 307 (5th Cir. 2011). His schizophrenia diagnosis and symptoms long predated his criminal case, and they prevented him from working or living on his own. *See*, *e.g.*, ROA.2150. In any event, the district court never suggested that Perkins was malingering, *see* ROA.230–31, and all three psychologists who evaluated him agreed that he was not exaggerating his symptoms, ROA.2013, 2033, 2041.

### b. Dr. Browning's outlier opinion is unconvincing because he did not explore Perkins's delusional beliefs.

Despite Perkins's prior diagnoses and persistent symptoms of schizophrenia, a government psychologist, Dr. Browning, disagreed that Perkins has schizophrenia. ROA.586. Dr. Browning's opinion, however, is entitled to little weight because he did not explore Perkins's delusional beliefs.[4]

As an initial matter, "conflicting diagnoses" of schizophrenia do not insulate the district court's competency determination from review. *Bruce*, 536 F.2d at 1054–55, 1060–62. In *Bruce*, like here, several doctors diagnosed Bruce with schizophrenia over many years. *Id.* at 1054–55. Still, the district court relied on the opinion of a lone doctor who, like Dr. Browning, "concluded that the other

---

[4] Another government psychologist—Dr. Biber—ruled out schizophrenia as a diagnosis more than a year before the second competency hearing. ROA.2015–16. But the government did not call Dr. Biber as a witness at the second competency hearing, ROA.229, or introduce her evaluation as evidence, ROA.226. Because Dr. Biber did not testify, Perkins could not cross-examine her. *See* 18 U.S.C. § 4247(d) (defendant has the right "to confront and cross-examine witnesses" at a competency hearing). And because the magistrate judge handled the first competency hearing, Dr. Biber's report was never before the district judge. Not surprisingly, the district court did not mention Dr. Biber's opinion in its competency order. *See* ROA.230–31. In any event, Dr. Biber's opinion is not persuasive.

doctors' diagnoses of schizophrenia were wrong." *Id.* at 1054–56. This Court held that the district court erred by relying on that doctor's opinion, explaining that the "overwhelming weight of the medical evidence pointed to schizophrenia" and "discredit[ed]" that doctor's contrary conclusion. *Id.* at 1061–62. In a similar case featuring "dueling psychiatrists," the Seventh Circuit also rejected the district court's reliance on a doctor's opinion that the defendant did not have schizophrenia. *Holmes v. Levenhagen*, 600 F.3d 756, 759, 762 (7th Cir. 2010). The court found that another doctor's diagnosis—that the defendant "suffer[ed] from schizophrenia, with symptoms that include delusions and hallucinations"—more compelling. *Id.* at 762.

So too here. Dr. Browning's opinion is unconvincing because Perkins did not discuss the details of his delusions and hallucinations during Dr. Browning's brief evaluation. ROA.583, 589, 2040. For instance, Perkins never mentioned—and Dr. Browning apparently never asked about—his belief that angels would resolve his case. ROA.589. So lacking firsthand knowledge of crucial symptoms, Dr. Browning was left to guess at what the medical evidence "suggests" as a "likely" explanation for the angels. ROA.2040. Moreover, Dr. Browning admitted that if Perkins *had*

discussed the angels, he would have wanted to explore the topic further. ROA.589. And Dr. Browning later conceded that Perkins's well-documented belief that angels would cause him to be released from jail sounded "like a delusion or a hallucination," ROA.590–91—two "key features" of schizophrenia, *see* DSM-5 at 87, 99.

For years, doctors repeatedly diagnosed Perkins with schizophrenia because he experiences hallucinations and delusions. This medical evidence discredits Dr. Browning's outlier opinion, which did not probe these symptoms. "In sum, the overwhelming weight of the medical evidence pointed to schizophrenia." *See Bruce*, 536 F.2d at 1062.

> ### 2. Perkins's delusion that cosmic forces would resolve his case prevented him from assisting his attorneys and understanding the proceedings.

Perkins also met the second step of the test showing that he was not competent to stand trial. To be found competent, a defendant must have *both* the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" *and* a "rational … understanding of the proceedings against him." *Dusky*, 362 U.S. at 402; 18 U.S.C. § 4241(d). Perkins had neither.

*First,* Perkins did not appreciate the "consequences of the proceedings against him." *See* 18 U.S.C. § 4241(d). Perkins was under an unfounded but unfaltering delusion that "angels"—not the jury, or the judge, or the evidence—would determine the outcome of his case. *See, e.g.,* ROA.2033–34, 2082. Because of this belief, Perkins did not believe that he was in legal jeopardy, ROA.552–53, and refused to even discuss plea agreements that could ensure him a lower sentence, ROA.422, 2031. *Second,* because Perkins believed that the result of his case was preordained by supernatural forces, there was little need for him to "assist … in his defense." *See* 18 U.S.C. § 4241(d). For example, Perkins said that he would rely on his angels' legal advice more than the advice of his attorneys. ROA.2031.

Those with the "best-informed view" of Perkins's competency, *Medina,* 505 U.S. at 450—his attorneys—expressed grave doubts about his competence early and often.

- Perkins's first lawyer, shortly after meeting with him to discuss his case—including the decisive decision of whether to plead guilty or go to trial—requested a mental examination based on his belief that Perkins "may be incompetent to such an extent that he cannot understand the proceedings against him or properly assist in his own defense." ROA.144.

- When new lawyers took over his case, they soon became "concerned about Mr. Perkins's competency" and moved for another competency hearing. ROA.2024. One attorney explained that Perkins "simply was not able to assist [counsel] with his defense despite a basic understanding of the proceedings." ROA.2024. According to another attorney, Perkins's mental condition presented "challenges to counsel's ability to effectively represent [him]." ROA.177.

- Another lawyer soon joined Perkins's defense, and he also urged the district court to find that Perkins was not competent. ROA.603. He said that Perkins was not making decisions based on "legal discussions" with his lawyers about evidence, elements of the crimes, burdens of proof, sentencing, or a potential plea agreement. ROA.601–03, 2082. Rather, Perkins believed that "otherworldly beings with cosmic powers will determine the outcome of the present case." ROA.2082.

- Later, counsel reiterated that Perkins was "incapable of discussing plea agreements" with his lawyers because he "fervently believed, on advice of an angel physically manifesting itself to him, that this case would be dismissed by [the district court] or the prosecutor." ROA.422. One plea agreement that Perkins rejected outright was pleading guilty to distribution (count one). *See* ROA.422. That charge carried a maximum sentence of 20 years, *see* 18 U.S.C. § 2252A(a)(2), (b)(1), a fraction of the 157-year sentence Perkins received.

Indeed, Perkins's attorneys had a "professional duty" to raise their competency concerns. *United States v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir. 1998); *see also* ABA Standards for Criminal Justice 7-4.3(c). Nothing in the record suggests that any of the four

attorneys who independently raised serious doubts about Perkins's competence and described difficulties working with him violated his or her duty of candor to the court. *See* Tex. Disciplinary R. of Prof. Conduct 3.03; *see also* W.D. Tex. Local R. AT-7 (adopting Texas Disciplinary Rules). Nor is there any evidence that counsel raised their competency concerns in anything but good faith. *See* ABA Standards for Criminal Justice 7-4.3(e) ("Neither party should move for an evaluation of competence in the absence of a good faith doubt that the defendant is competent to proceed."). Perkins's attorneys specifically denied raising competency "frivolously" or out of "gamesmanship," ROA.1084, and they confirmed that they "do not make it a practice to raise competency concerns absent substantial concerns with a client," ROA.2082.

These doubts raised by Perkins's attorneys are "unquestionably a factor" the district court should have considered. *Drope*, 420 U.S. at 178 n.13. Of course, the court's cursory order makes it impossible to determine whether it did so. The court's conclusion that Perkins was competent, however, suggests that the court overlooked counsel's repeated contentions that Perkins could not assist with his own offense. That fact alone supports reversal. *See McGregor v. Gibson*, 248 F.3d 946, 959–61 (10th Cir. 2001) (reversing conviction

where district court ignored attorney's opinion, "perhaps the most important" evidence of incompetence); *United States v. Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995) (criticizing district court's "[o]utright rejection" of attorney affidavit outlining competency concerns).

Despite these attorneys' adamant assertions to the contrary, Dr. Browning came to the remarkable conclusion that Perkins *could* assist his attorneys and understand the proceedings. ROA.2043–44. But, as discussed above, Dr. Browning's opinion is not persuasive because he failed to explore Perkins's delusions during the evaluation. *See supra* at 36–37. In any event, this Court has held that, at this stage of a competency determination, "expert testimony is not so important." *Bruce*, 536 F.2d at 1062. The D.C. Circuit has similarly explained that "counsel's first-hand evaluation of a defendant's ability to consult on his case and to understand the charges and proceedings against him may be as valuable as an expert psychiatric opinion on his competency." *David*, 511 F.2d at 360. This case proves the point. Four lawyers who represented Perkins over the course of *two years* believed that he was not competent to stand trial. By comparison, Dr. Browning's contrary opinion—formed over the course of *three or four hours*, ROA.573— is unconvincing.

Again, both *Bruce* and *Holmes* are on point. In *Bruce*, this Court noted that, like Perkins, Bruce suffered from hallucinations and had been hospitalized for schizophrenia. 536 F.2d at 1062. The Court concluded that "[o]nce Bruce's schizophrenia is acknowledged, the conclusion that the disease prevented him from rationally communicating with his attorney and understanding the proceedings is most compelling." *Id.* Thus, the Court reversed the district court's competency determination. *Id.* at 1063. And the Seventh Circuit explained that Holmes, like Perkins, "consider[ed] himself to be under continuous influence and sometimes assault by supernatural beings." *Holmes*, 600 F.3d at 759. The Seventh Circuit held that these symptoms of schizophrenia were an "impediment to [Holmes] communicating with his lawyers" and reversed the district court's competency determination. *Id.* at 759–63; *see also Lafferty v. Cook*, 949 F.2d 1546, 1554–55 (10th Cir. 1991) (vacating conviction on competency grounds because of defendant's inability to "accurately perceive reality due to a paranoid delusional system").

This Court should follow suit. As in *Bruce*, "what emerges from this record is a profile of a defendant with a severe psychiatric disorder which most probably caused him to misperceive important

elements of the proceedings against him and likely interfered with his ability to relate the true facts to his counsel." 536 F.2d at 1063.

### D.  Perkins needs hospitalization and treatment to determine whether his competency can be restored.

Reversing the district court's competency determination is not a get-out-of-jail-free card. Perkins will get out of prison (at least for now). But he will not be free. Rather, Perkins will be committed to the custody of the Attorney General and hospitalized for treatment. *See* 18 U.S.C. § 4241(d). This is "a massive curtailment of liberty." *Vitek v. Jones*, 445 U.S. 480, 491 (1980). Hospitalization—for a "reasonable period" not to exceed four months—will help "determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1). Dr. Schutte believes that, with treatment, the "[p]rognosis for competency restoration is considered good." ROA.2034. If Perkins improves, he will be able to stand trial (or rationally consider a plea agreement) consistent with the demands of the Constitution. If not, he could be civilly committed or released. *See generally United States v. McKown*, 930 F.3d 721, 727 (5th Cir. 2019).

In short, if this Court holds that Perkins was not competent to stand trial, it will not end this case. Rather, it would be only one more step on the long road to resolving the serious charges against him.

\*    \*    \*

Prosecuting Perkins violated the Constitution because he had neither "sufficient present ability to consult with his lawyer" nor "a rational … understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. This Court should reverse the district court's determination that Perkins was competent to stand trial, reverse Perkins's convictions on all counts, and remand for further proceedings under 18 U.S.C. § 4241.

## II.  Perkins's sentence is procedurally and substantively unreasonable.

Even if Perkins was competent to stand trial, the effective life sentence the district court imposed must be set aside. *First,* the court's sentence is procedurally infirm because it lacks any explanation for its vast variance from the Guidelines. *Second*, the court's apparently unprecedented 137-year variance above the Guidelines range—counsel's research could not locate another variance that extreme—cannot survive substantive-reasonableness

44

review. Under either rationale—or both—this Court should vacate the sentence and remand for resentencing.

### A.   Standard of review.

This Court reviews criminal sentences for "reasonableness." *Gall v. United States*, 552 U.S. 38, 46 (2007). *First*, the Court ensures that the district court committed no significant procedural error, *id.* at 51, reviewing the district court's "interpretation and application of the Sentencing Guidelines de novo," *United States v. Naidoo*, 995 F.3d 367, 382 (5th Cir. 2021). *Second*, the Court must consider whether the sentence is substantively reasonable, reviewing for abuse of discretion. *Gall*, 552 U.S. at 51.

### B.   Perkins's sentence is procedurally unreasonable because the district court failed to explain its staggering variance from the Guidelines range.

A sentencing court commits procedural error by "failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. The district court here imposed a vast upward variance: starting from a Guidelines range of 210-to-240 months, the district court sentenced Perkins to 1,860 months (more than 157 years). But the court never explained its 137-year variance from the Guidelines

range. This procedural error requires vacating Perkins's sentence and remanding for resentencing.

### 1. A district court must explain a sentence outside the Guidelines range, and a major variance must be supported by a compelling justification.

Before a district court can impose a sentence outside the Guidelines range, it "must give serious consideration to the extent of any departure from the Guidelines and must explain [its] conclusion that … an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46; *see* 18 U.S.C. § 3553(c)(2) (court must give "specific reason" for sentence outside the Guidelines range). The court's explanation must "allow for meaningful appellate review" and "promote the perception of fair sentencing." *Gall*, 552 U.S. at 50. The sentencing court must "ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* "The farther a sentence varies from the applicable Guideline sentence, the more compelling the justification based on factors in section 3553(a) must be." *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006) (cleaned up). So "a major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

### 2. The district court failed to explain its vast variance from the Guidelines.

Although the district court expressed some confusion over whether running the sentences on each count consecutively would require a variance, *see* ROA.1106, 1110–13, the court ultimately said that it would "vary upward," ROA.1113. And the district court's sentence was no doubt an upward variance (and a massive one at that). Section 5G1.2 of the Guidelines "specifies the procedure for determining the specific sentence to be formally imposed on each count in a multiple-count case." U.S.S.G. § 5G1.2 cmt. n.1. And "a district court can impose consecutive sentences 'only to the extent necessary to produce a combined sentence equal to the total punishment'—*i.e.,* equal to the top of the guidelines range." *United States v. Douglas*, 910 F.3d 804, 808 (5th Cir. 2018) (quoting U.S.S.G. § 5G1.2(d)). Any sentence above the top of the Guidelines range "constitutes an upward departure." *Id.* So the district court's 1,890-month sentence was an upward variance.

But the district court failed to explain its decision to vary astronomically from the Guidelines range. The court—when it still believed it was imposing a within-Guidelines sentence—simply said that it had considered the 18 U.S.C. § 3553(a) sentencing factors. ROA.1110. But a "single passing reference to § 3553(a)" is

not enough. *United States v. Chon*, 713 F.3d 812, 823 (5th Cir. 2013). And although Perkins argued at length for a downward variance, ROA.1083–95, 2128–35, the court did not address those arguments, *see United States v. Mondragon-Santiago*, 564 F.3d 357, 363 (5th Cir. 2009) (holding that district court's explanation for *within-Guidelines* sentence was inadequate because it failed to even "mention" defendant's sentencing arguments). Even after Perkins informed the court that consecutive sentences required an upward variance, the court provided no clarification, simply stating it would "vary upward" without further explanation. ROA.1113.

A court's reasons for imposing an outside-Guidelines sentence "must also be stated with specificity in a statement of reasons." 18 U.S.C. § 3553(c)(2). But the district court's statement of reasons here fails to illuminate its decision. None of the boxes listing reasons for a variance are checked, and the court simply notes that it gave its reasons for a variance "on [the] record during sentencing." ROA.1954; *see also* ROA.1958 (amended statement of reasons noting that "all reasons stated in open court"). As just explained, however, the court gave *no* reasons for the variance at sentencing.

48

In *United States v. Bostic*, 907 F.3d 607 (5th Cir. 2020), this Court confronted a similar situation. There, the district court imposed a sentence nearly eight times higher than the Guidelines range, but it did not explain its variance or address Bostic's arguments about the sentencing factors in § 3553(a). *Id.* at 611–12. Indeed, the district court's rationale in *Bostic*, which at least cited § 3553(a)(2)(A) and the fact that the offense there resulted in death, was *more* thorough than the district court here. *Compare id.*, *with* ROA.1110–11, 1113. Still, this Court found the district court's explanation "inadequate," vacated the sentence, and remanded for resentencing. *Bostic*, 907 F.3d at 612.

As in *Bostic*, the district court here committed procedural error by imposing a "dramatic deviation without commensurate explanation." *Id*. Thus, the Court should vacate Perkins's sentence and remand for resentencing.

## C. Perkins's sentence—including an unprecedented 137-year variance above the Guidelines range—is substantively unreasonable.

Because the district court procedurally erred in sentencing Perkins, this Court need not consider whether the sentence is substantively reasonable. *Bostic*, 970 F.3d at 612. But nothing

*prevents* the Court from reaching both procedural and substantive reasonableness. *See United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) (addressing both issues "in the interest of judicial economy"); *United States v. Lychock*, 578 F.3d 214, 216 (3d Cir. 2009) (holding that sentence was "procedurally *and* substantively unreasonable" (emphasis added)). This is the rare case in which the Court should reach both prongs. There is a very real risk that the district court may consider a decision addressing only procedural error an "invitation … to issue precisely the same sentence on remand," just with more reasoning. *Bostic*, 970 F.3d at 613 (Ho, J., dissenting). But no amount of explanation can justify the district court's draconian 157-year sentence.

### 1. Anchored by the advisory Guidelines range, a sentence must be no greater than necessary to comply with the statutory sentencing factors.

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (quoting 18 U.S.C. § 3553(a)). The Guidelines are a sentencing court's "starting point and the initial benchmark." *Gall*, 552 U.S. at 49. Because the Guidelines "anchor

… the district court's discretion," the court must "remain cognizant of them throughout the sentencing process." *Peugh v. United States*, 569 U.S. 530, 541, 549 (2013). The court must then consider the sentencing factors in 18 U.S.C. § 3553(a) to make an individualized assessment and decide whether the facts call for an outside-Guidelines sentence. *Gall*, 552 U.S. at 49–50. "The farther a sentence varies from the applicable Guidelines sentence, the more compelling the justification based on factors in section 3553(a) must be." *United States v. Hebert*, 813 F.3d 551, 562 (5th Cir. 2015) (cleaned up). In the "usual sentencing," however, the court will "impose a sentence within the [Guidelines] range." *Freeman*, 564 U.S. at 529.

### 2. The district court's sentence, which imposed a vast variance from an already harsh guideline, is not justified by the statutory sentencing factors.

Although appellate courts defer to a district court's determination that the § 3553(a) factors justify a variance, *Gall*, 552 U.S. at 51, "the sentencing court's discretion is not unlimited," *United States v. Hudgens*, 4 F.4th 352, 358 (5th Cir. 2021). This Court acts as a "check" on "extreme" deviations from the Guidelines. *United States v. Hoffman*, 901 F.3d 523, 555–59 (5th Cir. 2018). This

Court should fulfill its duty to act as a backstop against shockingly high sentences and hold that the district court abused its discretion by sentencing Perkins to 157 years in prison.

### a. As a starting point, the non-production child pornography guideline is particularly harsh because of escalating enhancements.

As noted above, the Guidelines are the "starting point" for any sentence. *Gall*, 552 U.S. at 49; *see also* 18 U.S.C. § 3553(a)(4)(A) (instructing courts to consider the Guidelines range). And for Perkins, the Guidelines recommended a severe sentence—210 to 240 months. *See* ROA.1079, 1936.

Courts have criticized the non-production child pornography guideline that Perkins was sentenced under—U.S.S.G. § 2G2.2—as being "harsher than necessary." *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009); *see Dorvee*, 616 F.3d at 187 (describing § 2G2.2 as "irrational[]"). Unlike most guidelines that are developed by the Sentencing Commission using an empirical data-based approach, *see Rita*, 551 U.S. at 349, § 2G2.2 includes sentencing enhancements "cobbled together" by Congressional directives, *Dorvee*, 616 F.3d at 184–86 (reciting history). Many of these enhancements—use of a computer, age of the victim, sadistic content, and more than 600

images (all of which applied to Perkins and added 13 offense levels, *see* ROA.1930–31)—"cover conduct that has become so ubiquitous that they now apply in the vast majority of cases." U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* 4 (2021). So even run-of-the-mill cases, like Perkins's, result in Guidelines ranges near or exceeding the statutory maximum. *See Dorvee*, 616 F.3d at 186–87. Because § 2G2.2 is so harsh, most defendants sentenced under it receive *downward* variances. *See* U.S. Sent'g Comm'n, *Interactive Data Analyzer*, https://ida.ussc.gov/ analytics/saw.dll?Dashboard.

To be clear, Perkins is not arguing that *any* sentence under § 2G2.2 is automatically unreasonable. *See United States v. Miller*, 665 F.3d 114, 118 (5th Cir. 2011) (affirming sentence under § 2G2.2 and explaining that, "[e]mpirically based or not, the Guidelines remain the Guidelines"). But as the starting point of the district court's analysis, it is relevant that applying § 2G2.2 alone—before any variance or departure—often results in "draconian" sentencing ranges. *United States v. Grober*, 624 F.3d 592, 596 (3d Cir. 2010). The district court took an already harsh guideline and doubled down— or, to be more precise, octupled down—by sentencing Perkins to nearly eight times the top of the Guidelines range.

### b.    None of the § 3553(a) factors justify the district court's vast variance from an already harsh guideline.

To impose an above-Guidelines sentence, the district court must determine that the § 3553(a) factors justify the variance. *Gall*, 552 U.S. at 51. None of the § 3553(a) factors justify the district court's 137-year upward variance here. If anything, these factors support a significant *downward* variance.

**Avoiding sentencing disparities.** Congress has instructed district courts to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The disparity between Perkins's sentence and sentences received by similar defendants is staggering.

Over the last five years, defendants sentenced under the same Guideline (§ 2G2.2) with the same offense level (37) and the same criminal history score (I) have received an average sentence of *146 months. See* U.S. Sent'g Comm'n, *Judicial Sentencing Information (JSIN)*, http://jsin.ussc.gov/. By contrast, the district court sentenced Perkins to *1,890 months* in prison. Perkins's sentence is about 13 times more than the average sentence. And while nearly 75% of

similar offenders receive a *downward* variance or departure from the Guidelines range, *id.*, Perkins received a massive *upward* variance.

Perkins's sentence even exceeds by many multiples the average sentence—264 months—for offenders sentenced under U.S.S.G. § 2G2.1 for the more serious offense of *producing* child pornography. *See* U.S. Sent'g Comm'n, *Interactive Data Analyzer*, *supra*. One example is particularly shocking. Some videos found on Perkins's devices were produced by David Diehl. ROA.912–16. While making ten videos, Diehl repeatedly sexually abused three girls between the ages of 3 and 10. *United States v. Diehl*, 775 F.3d 714, 725 (5th Cir. 2015). Diehl "induc[ed] the minors to engage in oral sexual contact with him, digital penetration, penile penetration, sodomy, lascivious exhibition of the genitals and pubic area of the minors, and masturbation." *Id.* For *producing* these videos, Diehl received a 50-year sentence (itself a significant variance). *Id.* at 726 (affirming sentence). For *possessing* these videos, Perkins received a 157-year sentence.

The drastic disparity between Perkins's sentence and those received by similar defendants—or even defendants engaging in much more heinous conduct—requires intervention by this Court to fulfill a crucial purpose of appellate review: "helping to avoid

excessive sentencing disparities." *United States v. Booker*, 543 U.S. 220, 264 (2005).

**Nature, circumstances, and seriousness of the offense**. When imposing a sentence, courts must also consider the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), as well as the "seriousness of the offense," *id.* § 3553(a)(2)(A). Although possessing and distributing child pornography are serious and reprehensible crimes, the circumstances of Perkins's case are quite typical.

Perkins used the most common method—a peer-to-peer file sharing network—for receiving and distributing child pornography. *See* U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography*, *supra*, at 33–34. Most offenders—like Perkins—store their collections on multiple devices and have images of young victims. *Id.* at 31, 34. And although Perkins had tens of thousands of images and videos, that is not unusual. Indeed, the "typical offender's collection" is "voluminous" because "technology has facilitated the ability to acquire and send enormous quantities of child pornography." *Id.* at 30. So offenders often have "collections numbering in the hundreds of thousands or even millions of images and videos." *Id.* at 34. In short, nothing about the circumstances of

Perkins's offenses justifies such a drastic variance from the Guidelines. *See Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (explaining that a variance deserves the "greatest respect" when the facts of a case are unusual).

**Perkins's history, characteristics, and need for medical care.** Next, courts must consider the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and the need to provide a defendant with necessary "medical care," *id.* § 3553(a)(2)(D). While Perkins's conduct may have been typical of a defendant charged with non-production child pornography offenses, Perkins himself is far from the typical offender.

Every medical expert agreed that Perkins suffers from autism spectrum disorder. ROA.2014–15, 2033, 2041–42. And a defendant's "mental illness" can "qualify as a compelling justification that may support a significant *downward* variance from the Guidelines range." *United States v. Robinson*, 778 F.3d 515, 523 (6th Cir. 2015) (emphasis added); *see United States v. Williams*, 553 F.3d 1073, 1084–85 (7th Cir. 2009) (holding that district court erred by overlooking defendant's autism disorder as a mitigating factor at sentencing). Perkins's autism spectrum disorder is a mitigating factor for three reasons.

*First*, autism was a major catalyst leading Perkins to collect child pornography. Autistic individuals commonly engage in repetitive behaviors. ROA.945, 2047; DSM-5 at 50. This can include collecting things, often "for no apparent reason other than the fact that they want to have a collection of something" and "they want to organize it by some characteristic." ROA.944–45. "This pattern of behavior can easily lead to fixating on pictures that would be inappropriate such as child pornography." Michael L. Perlin et al., *"Some Things Are Too Hot to Touch": Competency, the Right to Sexual Autonomy, and the Roles of Lawyers and Expert Witnesses*, 35 Touro L. Rev. 405, 428 (2019). Perkins compulsively downloaded explicit images largely as an "experiment[]" based on his understanding that, under Supreme Court precedent, it was legal to have images that depicted only nudity. ROA.701, 1920, 2046; *see New York v. Ferber*, 458 U.S. 747, 766 n.18 (1982) (analyzing child pornography statute and explaining that "nudity, without more is protected expression"). Perkins was interested in "learning the differences between pornography and nudity," ROA.2046, and "try[ing] to figure out what was legal and what was not," ROA.1920. Defendants, like Perkins, whose crimes are driven by mental illness do not "deserve as much

punishment as those who act maliciously or for gain." *United States v. Chatman*, 986 F.2d 1446, 1452 (D.C. Cir. 1993).

*Second*, autism impacts how Perkins perceived the images and videos he downloaded. Individuals with autism struggle to interpret emotions and facial expressions. ROA.946, 2015. Although they "may cognitively understand that their behavior is considered illegal, they often still do not appreciate its social and emotional implications, especially for victims of their crimes." Colleen M. Berryessa, *Defendants with Autism Spectrum Disorder in Criminal Court: A Judges' Toolkit*, 13 Drexel L. Rev. 841, 861 (2021). So an individual like Perkins "may look at child pornography but have no sense of the harm it is causing the child." Christine N. Cea, *Autism and the Criminal Defendant*, 88 St. John's L. Rev. 495, 503 (2014).

*Finally*, Perkins's autism makes even a short term of imprisonment—to say nothing of life in prison—daunting. Perkins prefers consistency in his routine and has difficulties adjusting to changes. ROA.2042. "Trouble with adaptive behavior can be particularly burdensome for an autistic individual in a prison setting, as adjusting to prison life in general is difficult for inmates, with or without disabilities." Cea, *Autism and the Criminal Defendant*, *supra*, at 526–27. Perkins also has communication

deficits, ROA.2015, which "may hinder interactions with prison staff, security staff, and other inmates," Berryessa, *Defendants with Autism Spectrum Disorder*, *supra*, at 862. Perkins's inability to understand social cues makes it more likely that he will be "victimized, exploited, or manipulated by other prisoners." *Id.* And, in fact, Perkins has already been attacked by other inmates.

Besides autism spectrum disorder, Perkins also suffers from schizophrenia. *See supra* at 32–34. This condition is a mitigating factor because it affects Perkins's ability to perceive reality. ROA.937–38; *see Robinson*, 778 F.3d at 523–24 (noting "significant" mitigating evidence for defendant diagnosed with schizoaffective disorder). It also requires hospitalization and treatment. ROA.2034. While the Guidelines require courts to consider how to provide a defendant with "medical care ... in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), "the Bureau of Prisons is not the best place for anyone to receive medical care," *United States v. Israel*, 2019 WL 6702522, at *11 (S.D.N.Y. Dec. 9, 2019).

**Protecting the public.** Another factor courts must consider is the need for a sentence to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Perkins poses little threat

to the public, and certainly not a threat requiring him to serve an effective life sentence.

*First*, Perkins has never sexually abused a child. ROA.1920. Although Perkins admitted that he would consider having sex with a child *if* the child prompted the encounter and *if* they had had a secure environment, he has never acted on that desire. ROA.1921.[5] And because of his mental and physical conditions, he is unlikely to do so. Perkins is homebound, he struggles in social situations, and he prefers not to interact with people. ROA.2014–15, 2151–52. He does not have a driver's license or a car, and walking long distances is painful. ROA.2151–52. And the conditions of supervised release prohibit him from having direct contact with anyone under 18. ROA.435.

*Second*, there is also little chance that Perkins will commit another offense involving online child pornography. The district

---

[5] Perkins admitted that he accidentally touched a girl's chest while roughhousing at a church event. ROA.1921. But Perkins—who was extremely honest and forthcoming with agents during the interview—denied that the incident was sexual. ROA.1921; *see* ROA.941 (Dr. Schutte explaining that individuals with autism spectrum disorder are often "brutally honest"). This isolated incident can hardly be considered, as the government suggested, Perkins "act[ing] upon" his desire to have sex with a minor. *See* ROA.1102.

court imposed strict conditions of supervised release limiting Perkins's computer usage and internet access. ROA.435–36. And his parents have committed to providing him housing "without internet of any kind." ROA.2152.

Not only does Perkins pose little threat, but this Court has approved much shorter sentences for defendants posing a much greater threat. *See*, *e.g.*, *Miller*, 665 F.3d at 116, 120 (affirming 220-month sentence for non-production child pornography defendant who admitted that "he feared that he would become a sexual predator or child rapist"); *Diehl*, 775 F.3d at 726 (affirming 50-year sentence for defendant who sexually abused three minors and produced child pornography).

**Providing just punishment and deterring criminal conduct.** Two more sentencing factors are the need "to provide just punishment for the offense" and the need "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A), (B). Given the factors already discussed—the drastically lower average sentence for similar defendants, the fact that Perkins's conduct was typical, Perkins's severe mental illnesses, and the negligible threat Perkins poses—there is no reason a 137-year variance above an already harsh Guidelines range is needed to provide just

punishment or to deter similar conduct. *See Rita*, 551 U.S. at 350 (explaining that the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives").

**Promoting respect for the law.** Finally, courts must consider the need for the sentence "to promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). Here, it is the district court's arbitrary and unprecedented variance that fails to promote respect for the law. This Court should vacate the court's sentence to restore a "perception of fair sentencing." *See Gall*, 552 U.S. at 50.

\*     \*     \*

Although possessing and distributing child pornography are no doubt serious and reprehensible crimes, the harsh guideline recommending that offenders spend roughly 20 years in prison reflects the gravity of these offenses. It is hard to imagine *any* case in which a 137-year variance could be reasonable. But this is not such a case. This Court has recognized that "the Supreme Court preserved a role for appellate review when it ruled that the Guidelines were only advisory." *Hoffman*, 901 F.3d at 555. And the "colossal" downward variance the Court found substantively unreasonable in *Hoffman*—from a range of 168 to 210 months in prison to 60 months of probation, *see id.*—pales in comparison to

the 1,650-month upward variance the district court imposed here. This Court should hold that Perkins's sentence is substantively unreasonable and remand for the district court to impose a lower sentence.

## CONCLUSION

The Court should hold that the district court clearly erred in finding Perkins competent to stand trial, reverse Perkins's convictions, and remand for further proceedings under 18 U.S.C. § 4241. In the alternative, the Court should hold that the district court's sentence was procedurally and substantively unreasonable, vacate Perkins's sentence, and remand for resentencing.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Carl R. Hennies
CARL R. HENNIES
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206-1205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,257 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

Dated: July 7, 2023